Mr. Kaufman, by way of Zoom, Mr. Kaufman, are you able to hear me okay? Yes, absolutely, Your Honor. All right, great. So you have ten minutes and you can begin whenever you're ready. May it please the court. We believe the court has erred by weighing or determining credibility, always against Mr. Valdes and not for the defendant. Further, the lower court has selected only certain conclusions or inferences from the facts among the competing conclusions or inferences. Again, however, only those conclusions or inferences that favored the defendant. At the summary judgment stage, the lower court should be weighing the evidence in the light most favorable to the unmoving party. There is not one instance in the entire written opinion where the court has favored testimony or evidence that supports the plaintiff's version of what occurred. In fact, in multiple hypotheticals, the lower court points out that even the plaintiff's expert gave this unfavorable opinion. However, in each of those instances, those hypotheticals ignore the plaintiff's version of what happened or assign an astounding level of believability. Let me ask you, Mr. Kaufman, because I think causation is, there are issues about whether or not the standard of care was breached or not, but on the issue of causation, the district court concluded on each of these, even construing the testimony most favorably to you and your client and drawing all inferences in your favor, that a jury could not rationally find causation here. And I want you to explain, for example, the lack of communication with Dr. Brendel. Your own expert said that it's unknowable whether there would have been a different outcome if they had consulted. So how would you plan to establish causation when your own expert describes that as unknowable? Well, in that scenario, he was saying that it was not within 100 percent certainty. Now, that's not the test. The test is the reasonable degree of medical certainty. And that degree is more probable than not. I know, but he didn't say that either, right? He didn't say that. He didn't say within a reasonable degree of medical certainty or even more probable than not. If he had consulted Dr. Brendel, this would have been avoided for these reasons. Then we'd be in a different category. Why don't you tell me what information did Dr. Brendel have if he had reached out to Dr. Brendel that would have averted him to some bigger, imminent threat of harm than he was aware of from his own observations during that day? Well, first off, Dr. Brendel was only one of the claims we were making. There were multiple claims. But as far as Dr. Brendel, in this case, the defendant had agreed not to talk to the treating physician at all. And I had discussed this with their expert and our expert if this was something that they would ever do in this situation. And the answer was no, of course not. I understand that, but if Dr. Brendel – I don't know if he was deposed, but if he was deposed and he said, well, if he had called me, I would have told him I had spoke to him earlier that day and he was saying a lot of things about harming himself imminently and I would have told those things to Dr. Brooks, then you might have a different situation. Your expert might have looked at it differently. Juries could look at that differently. But I don't think we have any type of – I don't know. Was Dr. Brendel deposed on that or what he would have said if he was a consultant? No, he wasn't deposed. The issue we had was that's not the only issue involved in this case, Your Honor. Mr. Kaufmann, before we move off this issue, didn't your expert say yes when asked if it was speculating to suggest that it would have mattered if Dr. Brooks and Dr. Brendel had talked? Yes, of course. So why doesn't that knock out the causation completely if your expert admits that it's speculation? Well, all cases involve speculation. In this scenario, he doesn't know what would have said or not said. The fact was he didn't even try. He didn't follow a duty. There was no follow-up, which is required. In this situation, we had – our client was saying, listen, I'm going to kill myself. I have all these problems. I'm closing my practice down. I'm giving medication out because I'm planning my death, and this is an emergency situation. Now, in an emergency situation, he can actually avoid complete discussions. Now, we don't know what the doctor might have said or not said at that point based on the information we had because we couldn't do it. All information is speculative in that case. But as far as that goes, that was only one of the small issues involved with the causation. We had a ridiculous amount of evidence showing that he was absolutely suicidal. He was closing his practice down. He was actually avoiding everybody. He was calling the doctor multiple times. Defendant has an independent duty to develop a follow-up plan, which he didn't do, and that was clear. Their expert said he had a duty to do it, and our expert said that. There's always going to be parts of a case that aren't as great as you want them to be. But in this case, it has to be the light most favorable. We, the judge in this case, completely didn't pay attention to anything that had suspended Mr. Valdez testified to. He said he spoke to the doctor. What safety plan did your expert testify to that could have avoided this tragedy? What did your expert say? What was the safety plan your expert said would have avoided this tragedy? It's a required follow-up done by all New York physicians in this case where suicide is involved, and never did it. Just arbitrarily chose not to do it. What do you mean follow-up? Explain that to me. He's not a psychiatrist. He's a- Explain that. What did you say? He should have had a follow-up. There's a required follow-up plan when somebody comes in for a suicide that you have to do. He never did that. And your expert said, did your expert say if he had done that, this would have been avoided? Did your expert say if he had done that- Yes, there's a possibility that would have happened. Remember, it only has to be a reasonable. It doesn't have to be 100%. There's a difference between a possibility and a likelihood. As I understand it, your expert said it was not necessarily a deviation for Dr. Brooks not to have a follow-up plan. Is that a sufficient basis for a jury to find that there was a deviation from the standard of care? When we depose their expert and our expert, there's always going to be an issue where they go, oh, here's a gotcha moment or here's not a gotcha moment. What I'm suggesting in this case is there was a ridiculous amount of evidence completely not paid attention to. I don't know what that means, a ridiculous amount of evidence. We keep asking you about specific testimony by your expert, including testimony that it was not necessarily a deviation for Dr. Brooks not to have a follow-up plan. And your response to that is what? The issue in that question, when that question was asked, it dealt with why you have to do a follow-up. You have to do this when it's a significant issue, when they believe suicide is definitely on the table. In this case, it was. We put that evidence forward. Now, what the judge said in this case was the plaintiff offers no evidence that this termination was not made in good faith. And we did have things forward. We had discussions with Mr. Valdez and the doctor that weren't even included in his order. I don't know if you're following up. I'm sorry. No, you have two minutes left. You can add anything else you want to add. I'll do what I can. One of the big thing is they disregarded conflicting testimony from Mr. Valdez and the defendant as it relates to certain admissions made on the phone call that occurred after the suicide. And our briefness is under Section Mark weighing credibility witnesses. The second is the lower court unfairly characterized the phrase unknowing, know-it-all, so as to be mutually exclusive from the phrase within reasonable degree of medical certainty. This is under the section of our brief that speaks to reasonable inferences. It is unrefuted that any doctor licensed to practice medicine in New York is required to document suicide IDH. In addition, for treating physicians such as the defendant in this case to develop a follow-up plan, for a treating physician, the follow-up plan is really the tool most likely to prevent a suicide if a suicide can be prevented at all. At the time of their last meeting between the deceased and the defendant, the defendant was aware that the deceased was actively treating for mental depression and suicidal thoughts by another doctor. The defendant was made aware of their relationship at the beginning of the treatment with the deceased. This didn't happen in one meeting. He knew this over multiple treatments that there was another doctor consulting, and he was just providing the medication. So the person who had the expert test meet could have been a better one to go to, and most doctors and, in fact, their own experts said they would have consulted. And I said, have you ever been in a situation where you haven't consulted? And he had handled thousands of cases. He said, no, I've never had one where I didn't consult with a treating physician. Now, this was the decision that Dr. Brooks intentionally made. Now, there were a lot of issues involved. We're not weighing our decision based on solely him not doing this or solely not doing that, but there was a lot of evidence out there that could have showed causation that we had out there. And that's really for a jury to decide, not just to pick one issue and go, okay, we're going to go with this one. Our expert gave the opinion that a follow-up plan would not be necessary if it was a fair determination that there was no imminent threat. We showed that there was imminent threat. He closed his practice down. He called them. He canceled all his appointments. He constantly tried to contact the doctor and said, this is an emergency. I want to kill myself. Now, if that's not imminent harm, that's for a jury to decide, not for the judge to decide. All right, thank you, Mr. Kaufman. We'll now hear from Ms. DeCrow-Goldberg. Good morning, Your Honors. May it please the Court. I'm Barbara DeCrow-Goldberg. I represent Dr. Brooks and his practice, New York Ketamine Infusions. I want to go back to another point that the district court made, because I think there are actually two bases upon which this court can affirm the determination of the district court. The only evidence in the record is that Dr. Brooks, during the examination on January 30th, 2017, conducted a careful examination. In fact, the plaintiff's expert, Dr. Reitman, conceded that based on his testimony, which he described what he did in detail, he asked the decedent questions, he looked at him, he assessed his mannerisms. Based on that testimony, plaintiff's expert conceded that Dr. Brooks conducted a careful examination. And in our brief, we have cited a number of cases that say that liability will not attach for failure to prevent suicide if doctor exercises his professional judgment after a careful examination. And that's what we have here. And I think it's erroneous for the plaintiff to state that Dr. Clota, the decedent, was, quote-unquote, closing down his practice. The evidence is that he said he wrote a few transfer notes, he wrote a few prescriptions. There's no testimony about him, quote-unquote, closing down his practice. He'd been trying to... Is there evidence as to whether Dr. Brooks knew about the transfer notes? He told Dr. Brooks that he had been writing transfer notes and prescriptions. But the important point is that by the end of the session, the infusion itself took about an hour, and then Dr. Brooks continued speaking to the decedent after the infusion, and based on everything that the decedent said, based on what he observed, based on what he knew, Dr. Brooks concluded that the suicidal ideation had abated. What did Dr. Brooks say about the fact that he was telling him not to contact his psychiatrist? That's a pretty... Isn't that an unusual thing to tell one doctor, I don't want you talking to my other doctor, especially in this context where you have suicidal ideations? I think that the way the district court described that was that it was somewhere less than typical, but somewhere more than unheard of. So it's certainly not a deviation. No one said that it was a deviation, as plaintiff said in his brief. Is there enough, then, for a jury to conclude that it was a deviation? Your Honor, I don't think that there is enough here for a jury to conclude that there's a deviation, because even the plaintiff's expert said that he had had patients who were suicidal, and then over the course of a day, over the course of observing the patient, the suicidal ideation had abated. And he was asked a number of questions at his deposition as to whether, I think one of the expressions was, can the patient step back from the abyss on his own? And he said yes. And he said that suicidal- But in that type of situation, wouldn't it be important to speak to the other doctor? If you have a patient who is at that level of planning, where I have suicidal ideations, and they ask, do you have a plan? Yes, I transferred some of my patients, whatever he said to that. He didn't say that in general. He said that as part of, I think, a response to, do you have a plan to show yourself? He didn't, he told Dr. Brooks that he didn't have a plan. He told Dr. Brooks that he didn't have any weapons. And I think it's important to note- Transferring the patients is what I'm saying, was not some general talk about his practice on transferring patients in the context of- He said he had written a few transfer notes and a few prescriptions, but importantly, he told- In that situation, you're a doctor, you're hearing that, and you know he's under the care of a psychiatrist, right? And he's telling you, don't speak to my psychiatrist. Isn't that a real red flag? Your Honor, I think the answer to that is that there is an exception under HIPAA, the Health Insurance Portability and Accountability Act, that a physician can breach a patient's confidentiality only when it's quote unquote necessary to prevent or lessen a serious and imminent threat to the health or safety of a person. And as the district court found, that applies only when the doctor makes a good faith determination that such a necessity exists. And the HIPAA regulations specifically defer to the professional judgment of a health care professional in making the determination of whether a patient- You're not suggesting that Dr. Brooks had called Dr. Brindel in this situation that would have been a HIPAA violation, is you suggesting that? I am suggesting that, Your Honor, that the patient had instructed him not to contact Dr. Brindel. He determined that the patient was not at an imminent risk of self harm. Therefore, the exception under HIPAA that would have allowed him to contact Dr. Brindel did not apply. And also, I think it would have jeopardized the therapeutic relationship with Dr. Brooks, if Dr. Brooks had violated the patient's express instruction not to contact Dr. Brindel. And- You also questioned the patient about why he was making that request. That would be another way of handling that. If you're concerned you have a HIPAA violation, you could ask the patient, well, why? I want to get as much information as possible. You're clearly suffering here. I think we can help you more if I speak to your doctor. You wouldn't just leave that alone, right? You would follow up on that, wouldn't you? I think that if the patient said, no, I don't want you to contact my doctor, and he concluded that the patient was no longer suicidal. And in fact, the patient had told him that the suicidal ideations had started abating the previous day before he came to Dr. Brooks. Under those circumstances, I don't think that the physician in the position of Dr. Brooks is obliged to contact the psychiatrist. And again, that brings us to the entire question of proximate causation. As the court pointed out during Mr. Kaufman's argument, Dr. Reitman specifically conceded that it was unknowable whether contacting Dr. Reitman was suicide, and his testimony was otherwise very speculative and conclusive. For instance, he testified that the communication could possibly have led to some kind of discussion or intervention that could have possibly prevented the occurrence. This is at pages 578 through 580 of the record. That does not reflect a reasonable degree of medical certainty. Basically, he's speculating. Dr. Reitman, the plaintiff's expert, never said concretely what would have happened if Dr. Brooks had contacted Dr. Brandel. He said that it's unknowable. And as for the safety plan of action that Mr. Kaufman referred to, Dr. Reitman specifically conceded that where no suicidal ideation persisted, an action plan would have been unnecessary. That's at pages 604 to 605 of the record. And he also conceded that at the time of the presentation to Dr. Brooks on January 30th, the patient was not at an imminent risk of harm to himself, and that's at page 584. And I think that it's very clear from the record that suicidal ideation can come on. It can pass. As I mentioned, even Dr. Reitman conceded that he'd had patients who stepped back from the abyss and their suicidal ideation had passed. And there's just no evidence that at the time he left Dr. Brooks's office on January 30th that the patient was suicidal or that he was at an imminent risk of harming himself. And I think it's important to point out that even over the course of the next two days, going into the evening of February 1st, before he committed suicide on February 2nd, he was in daily contact with the plaintiff, his husband. They spoke on the telephone, they texted several times a day. The plaintiff didn't notice anything amiss in their conversations. All he could say was that at the time of the final conversation, he sounded a little flat and he sounded a little sleepy. But there was nothing to indicate to the plaintiff that he was planning anything like this or that anything was wrong. And it came as a complete shock to everyone, Dr. Brendel included, Dr. Brooks, and of course the plaintiff. And I say I have about 20 seconds left if the court has no further questions, I will rest on the arguments in the brief. No, I don't think there are any other questions. Thank you. Thank you, both of you, and we'll reserve decision. Have a good day. Thank you. The last case, as I noted, is on submission, Stegman v. Price. That completes the business of the court. We thank Justice Ms. Spear, our deputy today. I would ask that she adjourn court. Court is being prepared.